NO. 09-35767

_____

IN THE STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

TIMOTHY McCOLLOUGH,

Plaintiff/Appellee,

-vs.-

JOHNSON, RODENBURG & LAUINGER,

Defendant/Appellant.

On Appeal From The Billings Division Of The
United States District Court, District Of Montana
U.S. District Court Cause No. CV-07-166-BLG-CSO

**BRIEF *AMICI CURIAE* OF AARP AND NATIONAL CONSUMER
LAW CENTER IN SUPPORT OF APPELLEES**

Julie Nepveu
AARP Foundation Litigation

Michael Schuster
AARP

601 E Street, NW
Washington, DC  20049
(202) 434-2060
jnepveu@aarp.org

**Attorneys for AARP And
National Consumer Law Center**

## CORPORATE DISCLOSURE STATEMENT OF AARP

The Internal Revenue Service has determined that AARP is organized and operated exclusively for the promotion of social welfare pursuant to Section 501(c)(4)(1993) of the Internal Revenue Code and is exempt from income tax. AARP is also organized and operated as a non-profit corporation pursuant to Title 29 of Chapter 6 of the District of Columbia Code 1951.

Other legal entities related to AARP include AARP Foundation, AARP Services, Inc., Legal Counsel for the Elderly, AARP Financial, AARP Global Network, and Focalyst.

AARP has no parent corporation, nor has it issued shares or securities.

## CORPORATE DISCLOSURE STATEMENT OF
## NATIONAL CONSUMER LAW CENTER

Pursuant to Federal Rules of Appellate Procedure 26.1, National Consumer Law Center discloses that they do not have parent corporations or stock holders.


_____/s/_____
Julie Nepveu

## TABLE OF CONTENTS

CORPORATE DISCLOSURE ...................................................................i

TABLE OF AUTHORITIES ..............................................................iv

STATEMENT OF INTEREST ...........................................................1

SUMMARY OF ARGUMENT ...........................................................3

ARGUMENT ....................................................................................4

I.    COLLECTION ABUSES ABOUND AS COLLECTION
OF STALE DEBT INCREASES .........................................4

    A.    Despite Legal Protections, Collection Abuses Top List
Of Consumer Complaints...........................................4

    B.    Debt Collections Increase Due To Unaffordable Debt
Loads In A Deregulated Financial Landscape...........................6

    C.    Debt Buyers Seek To Collect Stale Debt Previously
Considered Uncollectible............................................9

    D.    Systemically Inadequate Data Begets And Perpetuates
Abusive Collection Practices ...................................13

II.    JUDICIAL COLLECTION OF STALE DEBT IS FRAUGHT
WITH PROBLEMS DUE TO SYSTEMICALLY
INADEQUATE AND INACCURATE EVIDENCE ........................19

    A.    Collectors File Cases They Are Not Prepared To
Litigate, Knowing Most Will Result In Default Judgments
Against Alleged Debtors Who Acquiesce Rather Than
Defend Lawsuits ...................................................21

    B.    Adherence To Statutes Of Limitations Is Fundamental
To The Fairness Of The Justice System, Not Simply A
Technicality...........................................................23

      C.     Unreliable Representations And Filing Of Baseless Claims Are The Natural Consequences Of An Industry Which Rewards Collectors Who Lack Adequate And Accurate Information................................................................................26

CONCLUSION ........................................................................................29

STATEMENT OF RELATED CASES ...................................................30

CERTIFICATE OF COMPLIANCE......................................................31

CERTIFICATE OF SERVICE ...............................................................32

## TABLE OF AUTHORITIES

Cases

*Asset Acceptance Corp. v. Proctor*,
    804 N.E.2d 975 (Ohio Ct. App. 2004) ................................................. 20, 27

*Avila v. Rubin*,
    84 F.3d 222 (7th Cir. 1996) ...........................................................21

*Basile v. Blatt, Hasenmiller, Leibker & Moore, LLC*,
    632 F. Supp. 2d 842 (N.D. Ill. 2009)............................................20

*Bd. of Regents v. Tomanio*,
    446 U.S. 478 (1980)...................................................................23

*Chaudhry v. Gallerizzo*,
    174 F.3d 394 (4th Cir. 1999) ......................................................15

*Citibank (SD) N.A.*, *v. Whiteley*,
    149 S.W.3d 599 (Mo. Ct. App. 2004) .........................................20

*Citibank (SD), N.A. v. Martin*,
    2005 NY Slip Op 25536, 11 Misc. 3d 219, 807 N.Y.S.2d 284
    (Civ. Ct., NY Co. Dec. 16, 2005) ................................................26

*Clark v. Capital Credit & Collection Servs.*,
    460 F.3d 1162 (9th Cir. Or. 2006).......................................... 15, 21

*Discover Bank v. Owens*,
    822 N.E.2d 869 (Ohio Mun. Ct. Clev. 2004) ..................................8

*Erin Servs. Co., LLC v. Bohnet*,
    2010 NY Slip Op 50327U, *1 (N.Y. Dist. Ct. Feb. 23, 2010)......... 17, 21, 24

*FTC v. Colgate-Palmolive Co.*,
    380 U.S. 374 (1965)...................................................................21

*Garr v. U.S. Healthcare, Inc.*,
    22 F.3d 1274 (3d Cir.1994) .......................................................24

*Harrington v. CACV of Colo., LLC*,
    508 F. Supp. 2d 128 (D. Mass. 2007)...........................................................28

*Heintz v. Jenkins*,
    514 U.S. 291 (1995).......................................................................................5

*In re Blair, Amended Order Overruling Objection to Claims*,
    Civ. No. 02-1140 (W.D.N.C. Feb. 10, 2004) ................................................15

*Johnson v. MBNA*,
    357 F.3d 426 (4th Cir. 2003) ........................................................................20

*Kimber v. Fed. Fin. Corp.*,
    668 F. Supp. 1480 (M.D. Ala. 1987)................................................. 22, 23, 24

*Marquette Nat'l. Bank of Minneapolis v. First of Omaha Service Corp*,
    439 U.S. 299 (1978)........................................................................................7

*MBNA America Bank, N.A., v. Nelson*,
    15 Misc. 3d 1148[A], 841 N.Y.S.2d 826 (Table) (N.Y. Civ. Ct. 2007)........12

*McCollough v. Johnson, Rodenberg & Lauinger*,
    610 F. Supp. 2d 1247 (D. Mont. 2009) ........................................................28

*Midland Funding LLC v. Brent*,
    3:08-cv-1434, 2009 WL 2437243, *8 (N.D. Ohio 2009)................. 15, 26, 28

*Miller v. Upton, Cohen & Slamowitz*,
    -- F. Supp. 2d --, 1:01-cv-01126-RRM-RML, 2009 U.S. Dist.
    LEXIS 92414, 2009 WL 3212556 (E.D.N.Y. Sept. 30,
    2009) .................................................................................. 22, 23, 24, 25, 27

*Miller v. Wolpoff & Abrahamson, L.L.P.*,
    321 F.3d 292 (2d Cir. 2003) .........................................................................27

*MRC Receivables Corp. v. Zion*,
    No. 60926-2-I, 2009 WL 3418132 (Wash. App. Div. 1 2009) .....................26

*Nielson v. Dickerson*,
    307 F.3d 623 (7th Cir. 2002) ...........................................................................25

*Portfolio Acquisitions, LLC v. Feltman*,
    391 Ill.App.3d 642, 909 N.E.2d 876 (2009)...................................................20

*R.R. Telegraphers v. Ry. Express Agency*,
    321 U.S. 342 (1944)........................................................................................23

*Reichert v. National Credit Systems, Inc.*,
    531 F.3d 1002 (9th Cir. 2008) ......................................................................25

*Resurgence Financial, LLC v. Taylor*,
    05-07-01492-cv, 2009 WL 2712387 (Tex.App.Dallas 2009)............... 26, 27

*SEC v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) .........................................................................9

*Seipel v. Olympic Coast Investments*,
    2008 MT 237, 344 Mont. 415, 188 P.3d 1027 (2008) ...................................27

*Smiley v. Citibank (SD), N.A.*,
    517 U.S. 735 (1996).........................................................................................7

*Turner v. J.V.D.B. & Assocs., Inc.*,
    318 F. Supp. 2d 681 (N.D. Ill. 2004)...........................................................25

*United States v. Kubrick*,
    444 U.S. 111 (1979).......................................................................................23

## Other Authorities

Eileen Ambrose, *Zombie Debt,* Baltimore Sun (May 6, 2007) ...............................18

William Houston Brown, 1 *The Law of Debtors and Creditors* § 6.79 (rev.
    ed. Supp. 2007) ...........................................................................................11

Center For Responsible Lending, *The Plastic Safety Net: The Reality
    Behind Debt In America: Findings From A National Household
    Survey Of Credit Card Debt Among Low-And Middle-Income*

vi

*Households*, 20-21 (2005) ..............................................................................8

*Comment of ACA International Submitted to FTC* (June 6, 2006),
*available at* http://www.ftc.gov/os/comments/debtcollectionworkshop/
529233-00016.pdf (accessed April 2, 2010) .................................................16

*Comment of DBA Submitted to FTC* (June 2, 2007), *available at*
http://www.ftc.gov/os/comments/debtcollectionworkshop/529233-
00010.htm (accessed April 2, 2010)........................................... 10, 13, 14, 16

*Comment of Nat'l. Consumer Law Cntr. Submitted to FTC*
(June 6, 2007), *available at* http://www.ftc.gov/os/comments/
debtcollectionworkshop/529233-00018.pdf (accessed April 2, 2010)... 14, 18

*Comment of New York City Department of Consumer Affairs Submitted to
FTC* (Nov. 9, 2007), *available at* http://www.ftc.gov/os/comments/
debtcollection workshop/ 529233-0055.pdf (accessed April 2, 2010)..........19

*Comment of Portfolio Recovery Associates, Inc.*, *Submitted to FTC*
(June 5, 2007), *available at* http://www.ftc.gov/os/comments/
debtcollectionworkshop/ index.shtm (accessed April 5, 2010)....................16

Eric Dash, *Credit Card Companies Willing to Deal Over Debt,* N.Y. Times
(Jan. 2, 2009). .................................................................................9

*Debt Portfolio Prices Edge Higher*, Collections & Credit Risk (March 23,
2010), http://www.collectionscreditrisk.com/news/debt-portfolio-
prices-edge-higher-3001103-1.html (accessed April 2, 2010)....................10

*Examining The Billing, Marketing, And Disclosure Practices Of The Credit
Card Industry And Their Impact On Consumers, Before the S. Comm.
on Banking, Housing & Urban Affairs*, 110th Cong. 3 (Jan. 25, 2007)
(Statement of Prof. Elizabeth Warren) ...........................................................8

*Fair Debt Collection* (6th ed. 2008 & 2009 Supp.).....................................2

Federal Reserve Board, *Statistical Release - Consumer Credit Historical Data
(Revolving)*, *available* at www.federalreserve.gov/releases/g19/hist/
cc_hist_mt.txt (accessed April 2, 2010). .......................................................7

Federal Trade Commission, *Annual Report 2010: Fair Debt Collection*

*Practices Act* ...................................................................................6

Federal Trade Commission, *Collecting Consumer Debts: The Challenges
of Change, A Workshop Report* (Feb. 2009) ................................9, 10, 13, 19

Federal Trade Commission, *Statement of Basis and Purpose for the Credit
Practices Rule*, 49 Fed. Reg. 7740 (Mar. 1, 1984)..........................................7

Government Accountability Office, *Credit Cards: Increased Complexity in
Rates and Fees Heightens Need for More Effective Disclosures to
Consumers*, GAO-06-929 (Sept. 2006) ..........................................................8

Donna S. Harkness, *When Over-The-Limit is Over The Top: Addressing The
Adverse Impact of Unconscionable Consumer-Credit Practices on the
Elderly*, 16 Elder L.J. 1 (2008) .....................................................................22

Robert M. Hunt, *Collecting Consumer Debt in America,* Fed. Res. Bank
Phila. Bus. Rev. (Q2 2007)........................................................................9, 11

Suein Hwang, *Small Claims: Once-Ignored Consumer Debts Are Focus of
Booming Industry*, Wall St. J., A4 (Oct. 25, 2004) ....................................9, 10

Richard Hynes, *Broke But Not Bankrupt: Consumer Debt Collection In State
Courts,* 60 Fla. L. Rev. 1 (2008)....................................................................11

Kathleen W. Johnson, *Recent Developments in the Credit Card Market
and the Financial Obligations Ratio*, Fed. Res. Bulletin, 474 (Autumn
2005) ................................................................................................................6

Deanne Loonin, *Life and Debt Cycle* (2006).................................................8

Caroline Mayer, *New Breed Of Collectors Has Debtors Seeing Red,*
Washington Post (May 28, 2005).................................................................18

News Release, *Top 10 List of Consumer Complaints for 2008* (Aug. 31,
2009), http://www.naag.org/top-10-list-of-consumer-complaints-for-
2008-aug.-31-2009.php (accessed April 2, 2010) .........................................6

Corinna C. Petry, *Do Your Homework; Dangers often lay hidden in
secondary market debt portfolio offerings. Here are lessons from the
market pros that novices can use to avoid nasty surprises,* Collections

& Credit Risk, pg. 24, Vol. 12, No. 3 (March 2007)......................................13

Portfolio Recovery Associates LLC, *2008 Annual Report to SEC Form 10-K*
(Feb. 27, 2009) ................................................................................ 10, 12, 16

Michael Rezendes, Beth Healy, Francie Latour, Heather Allen, and
Walter V. Robinson (ed.)*, Debtor's Hell, IV Part Series,* Boston
Globe (July 30, 2006) ..................................................................... 11, 18, 19

Statement of Congressman Frank Annunizzo, 132 Cong. Rec. H10031
(Daily Ed. October 14, 1986) .........................................................................5

*Truth in Lending* (6th ed. 2007 & 2008)....................................................................2

Urban Justice Center, *Debt Weight: The Consumer Credit Crisis in New York
City and its Impact on the Working Poor* (Oct. 2007) ........................... 11, 21

Liz Pulliam Weston, *The Basics: 'Zombie Debt' is Hard to Kill,* MSN
Money (c. May 18, 2006) ..............................................................................18

Statutes

Consumer Credit Protection Act, S. Rep. No. 95-382 (1977)........................5

Credit Card Accountability Responsibility and Disclosure Act
of 2009, Pub. L. 111-24, Title I, § 108, 123 Stat. 1743 (May 22, 2009)
(15 U.S.C. § 1602)............................................................................................8

Pub. L. No. 99-361, 100 Stat. 768 (effective July 9, 1986) ............................5

15 U.S.C. § 1692g(b)....................................................................................15

## STATEMENT OF INTEREST

Debt collection suits have increased across the county, corresponding to rapidly rising debt loads, exorbitant credit card fees, and the current recession. Out of necessity and in rapidly increasing numbers, people are using high fee credit to pay for necessities like groceries, medical care, prescription drugs, house payments, and urgent house repairs. Despite the convenience credit cards provide, problems occur for too many people when they cannot pay off the full amount due, carry forward a balance, and get caught in a downward spiral of exorbitant interest rates, fees and penalties, and other billing practices that quickly drive them hopelessly further into debt. This downward spiral worsens and traps even more households in recessionary periods. A variety of unfair practices by credit card lenders increases outstanding balances by millions of dollars, which can then become the subject of questionable debt collections.

Not only do people carry more credit card debt than before, but more are being buried in what may be considered *unaffordable* debt. An increasing number of people have debt payments that exceed 40% of their income, and this increase is especially acute for older age groups. The consequences of unaffordable debt can be devastating, especially at a time in one's life when income typically decreases and remaining working years are limited. In addition, the more money devoted to servicing debt, the less there is available for savings and other resources to

1

preserve income security and financial independence, and even the basic necessities of life.

AARP is a non-partisan, non-profit membership organization. As the leading organization representing the interests of people aged 50 and older, AARP is greatly concerned about the growing level of debt, including credit card debt, being incurred by older people, many of whom are especially vulnerable to debt collection abuses.

The National Consumer Law Center, Inc., (hereinafter "NCLC") is a non-profit corporation. NCLC was organized in 1969 to conduct research, education and litigation to promote consumer justice. One of the NCLC's primary objectives is to provide assistance to attorneys advancing the interests of their low-income and elderly clients in the area of consumer law. Accordingly NCLC has focused considerable attention on laws to prevent abusive debt collection and unreliable disclosure of the terms of consumer credit transactions. The Fair Debt Collection Practices Act and the Truth in Lending Act have been a major focus of the work of NCLC. NCLC publishes *Fair Debt Collection* (6th ed. 2008 & 2009 Supp.) and *Truth in Lending* (6th ed. 2007 & 2008), comprehensive treatises, each over 1000 pages, to assist attorneys, creditors and debt collectors in complying with the law.

## SUMMARY OF ARGUMENT

Despite legal protection from abusive debt collectors, debt collection continues for over ten years to be the number one complaint by consumers to governmental agencies. Even with efforts by legislatures, state Attorneys General, and the Federal Trade Commission (hereinafter "FTC") to protect consumers, collection abuses continue to cause significant suffering and anguish.

The evolution of the debt buying industry, particularly involving credit card debt, presents significant challenges for consumers and courts. Debt collectors aggressively pursue judicial collection of debts previously considered to be worthless and uncollectible. Industry wide, debt buyers refuse to purchase the data necessary to verify the validity of the debt, and the information they do purchase is often inaccurate. The difficulties inherent in collection of stale debt based on inadequate information leads to collection of the wrong amount or from the wrong person, in violation of the Fair Debt Collection Practices Act. Debt collectors gain a litigation advantage as a result of this inadequate data, because the information necessary to verify disputes raised by alleged debtors, especially on stale debt, is unavailable.

Judicial collection of time-barred and/or unverifiable debt plagues court dockets across the country. Alleged debtors are typically unrepresented, and most cases end in default. Relying on this probability, collectors file cases they are not

prepared to litigate and often are unable to prove. As in this case, collectors also ignore evidence that establishes they are not entitled to judgment. Collection abuses should be discouraged through strong judicial insistence on adherence to pleading and evidentiary standards, as well as full adherence to the applicable statutes of limitations. There was no mistake in this case. Rather, the abuses were the natural consequences of a collection industry which rewards collection mills for having inadequate information in an over-burdened judicial system in which most judgments are granted by default. This Court should affirm the judgment.

## ARGUMENT

## I.     COLLECTION ABUSES ABOUND AS COLLECTION OF STALE DEBT INCREASES

Debt collectors aggressively pursue judicial collection of debts previously considered to be worthless and uncollectible. The evolution of the debt buying industry, particularly involving credit card debt, presents significant challenges for consumers and courts. The difficulties inherent in judicial collection of stale debt often result in violation of the Fair Debt Collection Practices Act.

### A.     Despite Legal Protections, Collection Abuses Top List Of Consumer Complaints

Congress enacted the Fair Debt Collections Practices Act (hereinafter "FDCPA" or "the Act") in 1977 to combat the "widespread and serious national

problem" of debt collection abuse.  Consumer Credit Protection Act, S. Rep. No.

95-382, at 2 (1977).  At that time, Congress found:

> While unscrupulous debt collectors comprise only a small segment of
> the industry, the suffering and anguish which they regularly inflict is
> substantial.

*Id*.  Specifically, the FDCPA was designed to "prohibit in general terms any

harassing, unfair, or deceptive collection practice," as well as to place restrictions

on the manner in which debt collectors could contact debtors.  *Id*. at 4.  The authors

of the Act also sought to curb "forum abuse," in which "collectors would file suit

against consumers in courts which are so distant or inconvenient that consumers

are unable to appear.  As a result, the debt collector obtains a default judgment and

the consumer is denied his day in court."  *Id*. at 5.  The FDCPA was subsequently

amended to remove the exemption for attorneys collecting debts on behalf of the

client.  Pub. L. No. 99-361, 100 Stat. 768 (effective July 9, 1986).  The sponsor of

the bill explained that the legislation was "a direct response to the explosive

growth in the number of law firms that had entered the debt collection business and

were abusing the exemption."  Statement of Congressman Frank Annunizzo, 132

Cong. Rec. H10031 (Daily Ed. October 14, 1986); *see Heintz v. Jenkins*, 514 U.S.

291 (1995) (holding the FDCPA applies to lawyers engaged in litigation).

Despite legal protection from abusive debt collectors, consumer complaints

about debt collection practices to state Attorneys General and the Federal Trade

Commission (hereinafter "FTC") have exceeded those for any other specific industry for over 10 years.[1]  Complaints about third-party debt collectors and in-house collectors in 2009 totaled 119,364 and accounted for 22.8% of all complaints the FTC received.  Federal Trade Commission, *Annual Report 2010: Fair Debt Collection Practices Act* 5.  Even with targeted enforcement actions by state Attorneys General and the FTC to combat widespread abuses by relatively large debt collectors, such collection abuses continue to cause substantial suffering and anguish.

### B.  Debt Collections Increase Due To Unaffordable Debt Loads In A Deregulated Financial Landscape

Debt collection begins with unaffordable credit that has resulted from the dramatic changes in the financial landscape since 1977.  Debt is pushed with little regard for ability to pay onto consumers who are already in a stressed financial condition. Frequently, creditors make their profits not from the regular repayment of the debt, but from the piling on of disproportionate fees and penalties.[2]  From

---

[1] News Release, *Top 10 List of Consumer Complaints for 2008*, (Aug. 31, 2009), http://www.naag.org/top-10-list-of-consumer-complaints-for-2008-aug.-31-2009.php (accessed April 2, 2010).

[2] Kathleen W. Johnson, *Recent Developments in the Credit Card Market and the Financial Obligations Ratio*, Fed. Res. Bulletin, 474 (Autumn 2005) (attributing increase in cardholding to the expansion of credit to riskier households--those that would not have previously qualified for a card).

the lack of underwriting to creditor practices that encourage default, increased debt collection becomes inevitable.

At the beginning of 1977, consumers carried revolving debt worth approximately $32 billion; by 2007 it had increased more than 27 times to $880 billion.[3] In 1977, there was no interstate banking, and credit card companies had to obey the laws of the borrower's home state. Federal Trade Commission, *Statement of Basis and Purpose for the Credit Practices Rule*, 49 Fed. Reg. 7740, 7747 (Mar. 1, 1984). In 1977, credit cards usually required only the payment of the finance charges, usually at an 18% APR, and a small annual fee. Late charges and other fees were unheard of in connection with credit cards. Credit card deregulation, and the concomitant spiraling credit card debt began in 1978 with a Supreme Court decision allowing banks to locate in states with lax or no usury caps and to extend the lax states' interest limits across state lines. *Marquette Nat'l. Bank of Minneapolis v. First of Omaha Service Corp,* 439 U.S. 299 (1978). Deregulation was furthered in 1996, with a Supreme Court ruling permitting credit card companies to avoid laws of the borrower's home state governing a wide variety of fees. *Smiley v. Citibank (SD), N.A.,* 517 U.S. 735 (1996).

---

[3] Federal Reserve Board, *Statistical Release - Consumer Credit Historical Data (Revolving)*, *available at* www.federalreserve.gov/releases/g19/hist/cc_hist_mt.txt (accessed April 2, 2010).

A significant amount of debt load is increasingly exacerbated by punitive tactics of the credit card industry to keep consumers on a treadmill of spiraling debt, fees, and charges for as long as possible.[4]  Industry tactics have intentionally trapped consumers into incurring added fees,[5] practices which have been described as "widespread financial exploitation of the [ ] poor by overbearing credit card companies."  *Discover Bank v. Owens,* 822 N.E.2d 869, 875 (Ohio Mun. Ct. Clev. 2004).  Indeed, "[a] debtor could pay nearly 100% of what she owed every year for the rest of her life, and thanks to the traps built in to her credit card, she would keep paying until she died—and still not pay off her card."  *Examining The Billing, Marketing, And Disclosure Practices Of The Credit Card Industry And Their Impact On Consumers, Before the S. Comm. on Banking, Housing & Urban Affairs*, 110th Cong. 3 (Jan. 25, 2007) (statement of Prof. Elizabeth Warren).  While the Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. 111-24, Title I, § 108, 123 Stat. 1743 (May 22, 2009) (15 U.S.C. § 1602) may limit some such practices, the astronomical debt accumulated prior to the effective date of the protections will continue to be subject to collection.  "Credit

---

[4] Center For Responsible Lending, *The Plastic Safety Net: The Reality Behind Debt In America: Findings From A National Household Survey Of Credit Card Debt Among Low-And Middle-Income Households* 20-21 (2005); Deanne Loonin, *Life and Debt Cycle*, Part 1, 3 (2006).

[5] Government Accountability Office, *Credit Cards:  Increased Complexity in Rates and Fees Heightens Need for More Effective Disclosures to Consumers*, GAO-06-929, at 20-21 (Sept. 2006).

card lenders expect to write off an unprecedented $395 billion of soured loans over the next five years…. [c]ompare[d] with a total of about $275 billion in the last five years."  Eric Dash, *Credit Card Companies Willing to Deal Over Debt,* N.Y. Times (Jan. 2, 2009).

### C.  Debt Buyers Seek To Collect Stale Debt Previously Considered Uncollectible

The debt collection industry has also evolved substantially, especially in the past decade.  "The most significant change . . . has been the advent and growth of debt buying (i.e., the purchasing, collecting, and reselling of debts in default)." Federal Trade Commission, *Collecting Consumer Debts: The Challenges of Change, A Workshop Report,* iv (Feb. 2009) (hereinafter "*Challenges of Change*"). Debt buyers focus on collection of debts previously considered by creditors to be worthless, because the cost of collection exceeded the potential value.  Greater efficiencies in the collection of debts, fed by communications advances have reduced transaction costs which traditionally hampered collections of small value and stale debts.  *See* Robert M. Hunt, *Collecting Consumer Debt in America,* Fed. Res. Bank Phila. Bus. Rev., 15-16 (Q2 2007) (describing the advent of WATS lines, predictive dialing, and computer software spurring debt collections); *Challenges of Change* at 13. Stale debt is now a commodity that is parsed, sold, and often resold multiple times at auction to the highest bidder.  *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 750-51 (11th Cir. 2007); Suein Hwang,

9

*Small Claims: Once-Ignored Consumer Debts Are Focus of Booming Industry*,
Wall St. J., A4 (Oct. 25, 2004). It is anticipated the collection industry overall will
net annual revenues worth $11.6 billion by 2011, while the estimated net revenue
collection law firms will reap is $2.3 billion. *Challenges of Change* at 13.

    Most stale debt is purchased for minimal cost. "Fresh chargeoffs are selling
in the upper end of the 3 cents to 8 cents on the dollar range. Older accounts,
worked by more than one agency, are fetching anywhere from fractions of a cent to
four cents on the dollar." *Debt Portfolio Prices Edge Higher,* Collections & Credit
Risk (March 23, 2010), http://www.collectionscreditrisk.com/news/debt-portfolio-
prices-edge-higher-3001103-1.html (accessed April 2, 2010). Debt buyers pay less
for debt in "certain states [that] have more debtor-friendly laws than others and,
therefore, are less desirable from a collectibility perspective." Portfolio Recovery
Associates LLC, *2008 Annual Report to SEC Form 10-K,* 8 (Feb. 27, 2009)
(hereinafter "*Portfolio 10-K*").[6]

    While the promise of greater profit margins encourages aggressive collection
of increasingly stale debt, the inverse relationship of cost to age "is due to the fact
that older receivables typically are more difficult to collect." *Portfolio 10-K* at 7.

---

[6] Portfolio Recovery Associates is one of 5 publicly traded debt buyers. The others
are Asset Acceptance Corp., Encore Capitol Group, Inc., Asta Funding Inc., and
First City Financial Corp. Each have 10-K statements which similarly describe the
industry. There are thousands of privately held debt buyers. *See Comment of DBA
Submitted to FTC*, 2 (June 2, 2007), *available at* http://www.ftc.gov/os/comments/
debtcollectionworkshop/529233-00010.htm (accessed April 2, 2010).

Collectors use sophisticated computer models to predict which collection methods are most likely to achieve results with a particular debtor. *See* Hunt, *Collecting Consumer Debt,* at 15-16. Judicial collection is used increasingly by debt buyers to collect and re-age stale debt.[7] Therefore, the judicial environment itself is critical to a debt buyers' ability to collect stale debts.

This trend is having a significant impact on courts. An exposé of debt collectors' mill flooding the Massachusetts trial courts illustrated the enhanced role of the debt collector on the court's mostly debt collection docket. Michael Rezendes, Beth Healy, Francie Latour, Heather Allen, and Walter V. Robinson (ed.)*, Debtor's Hell, IV Part Series,* Boston Globe (July 30, 2006) (hereinafter "*Debtor's Hell*"). In Virginia courts, 70-80% of all filings are collection cases. Richard Hynes, *Broke But Not Bankrupt: Consumer Debt Collection In State Courts,* 60 Fla. L. Rev. 1, 51 (2008). In New York City, annual filing of debt collection cases increased by more than 60% between 2002 and 2007. Urban Justice Center, *Debt Weight: The Consumer Credit Crisis in New York City and its Impact on the Working Poor*, 1 (Oct. 2007) (hereinafter "*Debt Weight*").

---

[7] Securing even a minimal payment from a debtor will extend the statute of limitations. Obtaining a judgment permits collectors in nearly every state to pursue debt collection indefinitely. *See* William Houston Brown, 1 *The Law of Debtors and Creditors* § 6:79 (rev. ed. Supp. 2007).

Courts should anticipate that the total number of collections will continue to increase. According to one debt buyer, as "portfolios mature . . . we anticipate that legal collections will grow commensurately and comprise a larger percentage of our total cash collections." *Portfolio 10-K* at 8. In light of the increasing reliance by debt buyers on judicial collections, "[t]he judiciary continues to provide an important role in safeguarding consumer rights and in overseeing the fairness of the debt collection process." *MBNA America Bank, N.A., v. Nelson*, 15 Misc. 3d 1148[A], *1, 841 N.Y.S.2d 826 (Table) ( N.Y. Civ. Ct. 2007). The *MBNA* court warned that:

> The entire [debt buying] industry is a game of odds, and in the end as long as enough awards are confirmed to make up for the initial sale and costs of operation the purchase is deemed a successful business venture. However, during this process mistakes are made, mistakes that may seriously impact consumers and their credit.

*Id*. The court aptly observed that debt is sold at such a cheap price for "the simple fact that the proof required to obtain a judgment in the creditor's favor is lacking, *usually as a result of poor record keeping on the part of the creditor*." *MBNA* at *2 (emphasis added). This record keeping problem is compounded by multiple re-sales of debt. For example, according to an officer of an Illinois debt buyer who had purchased, or ostensibly purchased, bad paper, "[t]he same portfolio is sold to multiple buyers; the seller doesn't actually own the portfolio put up for sale; half the accounts are out of statute [of limitation]; accounts are rife with erroneous

12

information; access to documentation is limited or nonexistent."  Corinna C. Petry,

*Do Your Homework; Dangers often lay hidden in secondary market debt portfolio*

*offerings. Here are lessons from the market pros that novices can use to avoid*

*nasty surprises,* Collections & Credit Risk, pg. 24, Vol. 12, No. 3 (March 2007).

### D. Systemically Inadequate Data Begets And Perpetuates Abusive Collection Practices

Industry wide, problem data begets and perpetuates abusive collections.

Both consumers and the courts are vulnerable to manipulation and abuse because

the debt buying industry, by design, pursues collections based on inherently

inadequate data.  According to the FTC, "[w]hen accounts are transferred to debt

collectors, the accompanying information often is so deficient that the collectors

seek payment from the wrong consumer or demand the wrong amount from the

correct consumer."  *Challenges of Change* at 25.

In most debt buyer transactions, only small portions of electronic data

regarding the alleged account are provided or available to the first debt buyer,

despite the fact that original "[c]reditors typically store itemized data for all of their

accounts in large electronic databases during the entire time they own the

accounts."  *Challenges of Change* at 31.  Typically, "the initial data provided by

the seller [ ] includes information such as the date of delinquency, the date of last

payment, last known address, balance due, the debtor's personal identification

information, and the history of the account."  *Comment of DBA Submitted to FTC,*

13

*8* (June 2, 2007), *available at* http://www.ftc.gov/os/comments/debtcollection workshop/529233-00010.pdf  (accessed April 2, 2010) (hereinafter "*DBA Comment*").  When debt is resold, subsequent purchasers have even less access to the original account data.  Critical information necessary to validate debts that is typically *omitted* from the sales process includes:

- consumer complaints about billing errors
- payments not credited
- settlement agreements not honored
- identity theft
- mistaken listing of an account user as an account holder responsible for the whole account balance
- the consumer's representation by an attorney
- the evidence of a contract, or
- payment history.

*Comment of Nat'l. Consumer Law Cntr. Submitted to FTC*, 12-13 (June 6, 2007), *available at* http://www.ftc.gov/os/comments/debtcollectionworkshop/529233-00018.pdf (accessed April 2, 2010) (hereinafter "*NCLC Comment*").

The limited data that is purchased often provides an inadequate basis on which to seek a judgment.  Debt buyers do not pay for – *and have very limited or no access to* – documentation which would constitute admissible evidence to prove the alleged debtor in fact opened the account, used the credit card, or agreed to the terms, interest rates, or attorneys fees imposed and added to the purported principal amount.  As a result, debtors seeking validation of a debt typically are unable to gain access to any information about the account being collected, and are deprived

14

of the ability to challenge erroneous transactions or demonstrate how much of their debt is due to purchases versus questionable finance charges and junk fees. *See In re Blair, Amended Order Overruling Objection to Claims,* Civ. No. 02-1140 (W.D.N.C. Feb. 10, 2004) (finding claims against 31 different individuals in bankruptcy court by major credit card company revealed that on average, 57% of the debts consisted of interest and fees).

"It is unsurprising when a consumer/debtor contacted by a collection agency about a seven-year-old debt would question whether it was a valid obligation." *Midland Funding LLC v. Brent,* 3:08-cv-1434, 2009 WL 2437243, *8 (N.D. Ohio 2009). But alleged debtors with valid disputes face significant frustration as a result of the industry-wide failure to purchase adequate information. The FDCPA imposes two specific verification requirements on debt collectors: obtaining verification from the creditor and mailing that verification to the debtor. 15 U.S.C. § 1692g(b). These requirements are designed to prevent debt collectors from "dunning the wrong person or attempting to collect debts which the consumer has already paid." *Chaudhry v. Gallerizzo,* 174 F.3d 394, 406 (4th Cir. 1999); *accord Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1173 (9th Cir. Or. 2006) (adopting standard).

Debt buyers concede that the industry's "lack of such records fail to serve the interests of consumers in obtaining documentation of disputed accounts or the

legitimate interests of credit grantors and debt collectors in collecting debts that are genuinely owed." *Comment of Portfolio Recovery Associates, Inc., Submitted to FTC*, 2 (June 5, 2007), *available at* http://www.ftc.gov/os/comments/ debtcollectionworkshop/index.shtm (accessed April 5, 2010).  They also acknowledge that lack of information masks valid defenses: "[i]f the credit originator fails to comply with applicable statutes, rules and regulations, it could create claims and rights for consumers that could reduce or eliminate their obligations to repay the account and have a possible material adverse effect on us." *Portfolio 10-K* at 18.  Debt buyers nevertheless defend the inherently inadequate industry practice, claiming that "[t]he due diligence process and representations and warranties in the purchase agreement help ensure the accuracy and integrity of the debts sold." *DBA Comment* at 12.  But "[n]o amount of due diligence prior to the purchase of a portfolio can cure deficiencies in the original data transmitted by an original credit grantor." *Comment of ACA International Submitted to FTC*, 43 n.55 (June 6, 2006), *available at* http://www.ftc.gov/os/comments/ debtcollectionworkshop/529233-00016.pdf (accessed April 2, 2010).  Moreover, while such warranties may protect the first debt buyer, they do not protect subsequent purchasers when debt is resold.

The systemic failures also harm alleged debtors.  Despite industry-wide recognition of the data problems, collectors unfairly and inaccurately portray

alleged debtors as "deadbeats" and seek to excuse their own role in ignoring valid

defenses and responsibility for inadequate information. Such arguments in this

case were rejected by the jury below. Appellee's Br. at 18. The trial court found

as a matter of law that JRL violated the FDCPA by filing a lawsuit it knew or

should have know to be time-barred and seeking attorneys fees to which it was not

entitled. Appellee's Br. at 16-17. Courts have criticized that "lawyers engaged in

the collection of assigned debts seem especially prone to pursuing claims

improperly, often at the expense of the most vulnerable members of our society."

*Erin Servs. Co., LLC. v. Bohnet*, 2010 NY Slip Op 50327U, *1 (N.Y. Dist. Ct. Feb.

23, 2010). The court found:

> No proof of due diligence in investigating the accuracy of the
> different listings is submitted. The computer records are also notable
> for what they fail to include: namely, proof of the assignment of the
> original account by First USA, proof that defendant actually owed
> money on that account at the time of the assignment, and proof that
> plaintiff had a good faith basis for pursuing the claim at the time the
> action was commenced in 2004. Indeed, to this day counsel has failed
> to provide a scintilla of evidence that defendant was actually indebted
> to First USA many years ago, or that plaintiff Erin Services acquired a
> lawful assignment of a bona fide debt.

*Id*. at *3.

With or without warranties from the creditor, and regardless of the accuracy

of the limited data obtained, collectors violate the FDCPA when they fail to

evaluate even the  data that is available and ignore obvious legal impediments to

pursuing judicial collection. For example, CACV explicitly disclaimed any

17

warranties as to the accuracy or validity of the data provided regarding Mr. McCollough's account. Appellee's Br. at 10. JRL initially recognized that the account was in a batch of data that was problematic and flagged the statute of limitations bar before filing suit. *Id*. at 10-11. JRL failed to recognize that CACV had previously sued Mr. McCollough on this account, and that the suit had been dismissed after Mr. McCollough pled the statute of limitations. *Id.* at 12.

Moreover, even if a particular collector agrees to cease collection following the validation process, it may nevertheless sell the debt to another debt buyer, who will in turn have inadequate or erroneous information about the debt and will not know the alleged debtor has a valid dispute. Debt buyers are also known to sell debt which is ostensibly the result of identity theft, settled, discharged in bankruptcy, or which has been paid in full. *NCLC Comment at 27-28.* Each time a disputed debt is re-sold, a debtor must re-engage in the same frustrating and often futile process to dispute the debt. Such debt has been dubbed "zombie debt" for apt reasons; it is hard to defend against and it seemingly never dies.[8]

---

[8] There are numerous accounts of such collections. *See, e.g*., Eileen Ambrose, *Zombie Debt,* Baltimore Sun (May 6, 2007); Michael Rezendes, Beth Healy, Francie Latour, Heather Allen, and Walter V. Robinson (ed.)*, Debtor's Hell, IV Part Series,* Boston Globe (July 30, 2006); Liz Pulliam Weston, *The Basics: 'Zombie Debt' is Hard to Kill,* MSN Money (c. May 18, 2006); Caroline Mayer, *New Breed Of Collectors Has Debtors Seeing Red,*" Washington Post (May 28, 2005).

## II. JUDICIAL COLLECTION OF STALE DEBT IS FRAUGHT WITH PROBLEMS DUE TO SYSTEMICALLY INADEQUATE AND INACCURATE EVIDENCE

Courts operate at ground zero of the debt collection explosion. While the FTC acknowledges the persistence and increasing incidence of abusive debt collection complaints, it believes that "states should take primary responsibility to address abuses in the debt collection process" because "[v]irtually all collection proceedings are decided in state court through the application of state substantive and procedural law." *Challenges of Change* at 65. But burgeoning dockets of collections cases are presenting challenges to courts across the country. "Judges have expressed concern that the burden of handling the number of debt collection lawsuits on their dockets is making it difficult for them to handle other cases in an expeditious manner." *Challenges of Change* at 56.

One significant concern is that "debt collection efforts are initiated and proceed through the court process despite insufficient proof demonstrating that a debt is actually due and owing." *Comment of New York City Department of Consumer Affairs Submitted to FTC*, at 2 (Nov. 9, 2007), *available at* http://www.ftc.gov/os/comments/debtcollectionworkshop/529233-0055.pdf (accessed April 2, 2010); *Debtor's Hell.* Lacking adequate proof, debt buyers nevertheless pursue purported debtors by simply offering up an affidavit from an employee in their loss recovery department and/or suing on an account-stated

theory. *See, e.g.*, *Johnson v. MBNA*, 357 F.3d 426 (4th Cir. 2003) (finding

investigation of dispute by wife inadequate where MBNA could not locate credit

application showing whether husband, wife, or both were responsible for card

purchases); *Portfolio Acquisitions, LLC v. Feltman*, 391 Ill.App.3d 642, 909

N.E.2d 876 (2009) (holding if contract must be proved by parole evidence, five

year statute of limitations for unwritten contract applies, not ten year statute for

written contract); *Basile v. Blatt, Hasenmiller, Leibker & Moore, LLC*, 632 F. Supp.

2d 842 (N.D. Ill. 2009) (same); *Citibank (SD) N.A., v. Whiteley*, 149 S.W.3d 599

(Mo. Ct. App. 2004) (holding bank failed to prove by substantial evidence account

stated claim); *Asset Acceptance Corp. v. Proctor*, 804 N.E.2d 975 (Ohio Ct. App.

2004) (holding creditor failed to provide evidence that would permit a calculation

of the balance due).

Debt collectors frequently file lawsuits which may not be factually valid and

which they are not prepared to litigate, with the expectation that a large number of

consumers will not defend themselves. Even when a debt collector violates the

law, the chances of being caught are minimal and the consequences are cheap. But

as demonstrated in this case, when a debtor does defend a claim, debt collection

law firms may be left scrambling, because by design, the industry practice makes

unavailable the data and documents necessary to prove a claim. *See* Appellant's

Br. at 16, (describing "urgent" email to obtain account documents). As this Court

has "oft repeated, it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Clark*, 460 F.3d at 1171 (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393 (1965)); *see also Erin Servs.*, 2010 N.Y. Slip Op. at *2 (sanctioning collection law firm $14,800 for "multiple acts of frivolous conduct").

## A. Collectors File Cases They Are Not Prepared To Litigate, Knowing Most Will Result In Default Judgments Against Alleged Debtors Who Acquiesce Rather Than Defend Lawsuits

Because most debt buyer lawsuits result in victory by default, collectors benefit from the probability that debtors will not defend themselves. A recent report found that in 2006, collectors in New York City obtained default judgments in 80% of cases filed, and 90% of those cases were brought by debt buyers, similar to experiences in other jurisdictions. *Debt Weight* at 17. Even more startling, debt buyers have learned to work the system to win judgments and coerce payments even when they have the wrong person, or lack any evidence that the consumer owes the debt. As in this case, they may even ignore evidence that demonstrates the statute of limitations has run on the debt, hoping to induce payment of the debt. "An unsophisticated consumer . . . knows the price of poker has just gone up." *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996). The ramifications of a judgment is often enough to make an alleged debtor fold his hand, even if he has a valid defense.

21

> [T]he judgment will impose costs on the consumer by damaging the consumer's credit rating. . . [which] does more than merely raise the consumer's cost of credit. A damaged credit score can make it difficult to rent an apartment, find a job, or even purchase automobile insurance. . . . credit reports typically do not record the filing of the lawsuit, but they do record judgments. Therefore, a civil filing serves as a credible threat to inflict harm on the defendant and may induce the defendant to pay.

Hynes, 60 Fla. L. Rev. at 20. Indeed, many older people believe they will have to go to jail if they are summoned to court. *See* Donna S. Harkness, *When Over-The-Limit is Over The Top: Addressing The Adverse Impact of Unconscionable Consumer-Credit Practices on the Elderly*, 16 Elder L.J. 1, 3-4 (2008).

Collectors have a distinct advantage in litigation over alleged debtors, who do not understand that statistically, debt buyers have no possible way of obtaining evidence in the vast majority of cases they file. The typical alleged debtor faced with a court summons may believe that a collector would not be able to bring a case that could not be proven in court and that he has no choice but to make payments if he wishes to avoid a judgment. *See Kimber v. Fed. Fin. Corp*., 668 F. Supp. 1480, 1489 (M.D.Ala. 1987) (reasoning that unsophisticated "consumers would unwittingly acquiesce" to a time-barred lawsuit instead of defending against it). Moreover, as the Court noted in *Miller v. Upton, Cohen & Slamowitz*,

> even if the consumer realizes that she can use time as a defense, she will more than likely still give in rather than fight the lawsuit because she must still expend energy and resources and subject herself to

the embarrassment of going into court to present the defense; this is
particularly true in light of the costs of attorneys today.

*Id.,* -- F. Supp. 2d --, 1:01-cv-01126-RRM-RML, 2009 U.S. Dist. LEXIS 92414

21-22, 2009 WL 3212556 (E.D.N.Y. Sept. 30, 2009).

### B. Adherence To Statutes Of Limitations Is Fundamental To The Fairness Of The Justice System, Not Simply A Technicality

The Supreme Court repeatedly has pointed out that "[s]tatutes of limitations

are not simply technicalities. On the contrary, they have been long respected as

fundamental to a well-ordered judicial system." *Bd. of Regents v. Tomanio*, 446

U.S. 478, 487 (1980). When a collector pursues a stale claim, "the search for truth

may be seriously impaired by the loss of evidence, whether by death or

disappearance of witnesses, fading memories, disappearance of documents, or

otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (quoting *R.R.*

*Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 349 (1944)); *Kimber*, 668 F.

Supp. at 1487. Indeed, "it is unjust to fail to put the adversary on notice to defend

within a specified period of time and that the right to be free of stale claims in time

comes to prevail over the right to prosecute them." *Kubrick*, 444 U.S. at 117.

Alleged debtors may well have lost important evidence of a dispute needed to

defend against a collection on a stale or time-barred claim.

This recognition is especially critical in cases involving primarily *pro se*

debtors. *Kimber* explained that

23

> [T]he unfairness of [filing suit on a time-barred debt] is particularly clear in the consumer context where courts have imposed a heightened standard of care -- that sufficient to protect the least sophisticated consumer. Because few unsophisticated consumers would be aware that a statute of limitations could be used to defend against lawsuits based on stale debts, such consumers would unwittingly acquiesce to such lawsuits.

*Id.*, 668 F. Supp. at 1489.

In addition to viewing the FDCPA claims through the eyes of an "unsophisticated debtor," courts justifiably require of attorneys a basic level of professionalism and independent judgment when they file litigation and do not tolerate excuses for failure to exercise professional care. *See Erin Servs. Co., LLC.*, 2010 NY Slip Op at *1 (finding 18 ethical violations, warning "'[h]igh volume' debt collection law practices are subject to the same ethical rules as apply to lawyers handling any other civil litigation matter."); *Miller* at *8 (finding "[a]s in the analogous Rule 11 context, an attorney responsible for issuing and executing a legal document 'must make a reasonable inquiry *personally.*'" (quoting *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1280 (3d Cir.1994))). In *Miller*, the court criticized attorney reliance on the evaluation of governing law made by previous collectors and the failure to undertake any independent review as being "a naked attempt to substitute their judgment for his own in derogation of his professional duties and his obligations under the FDCPA." *Miller* at *10. *Miller* concluded:

> in cases such as here, where an attorney commences suit in so uninformed a manner that he is ignorant even as to what law governs

24

his suit, it cannot be said that he has undertaken a level of review sufficient to satisfy even the most general requirements applicable to attorney conduct, let alone the more focused review requirements established by the FDCPA.

*Id*. at \*13.

In this case, JRL similarly seeks to avoid any consequences for its failure to exercise sufficient legal and professional judgment before filing litigation on a debt it knew or should have known was time-barred and for seeking attorney's fees to which it was not entitled, without ever having seen the contract governing the debt. As in *Reichert v. National Credit Systems, Inc.*, 531 F.3d 1002 (9th Cir. 2008), this Court should reject JRL's contention that it is entitled to a bona fide error defense, which would reward rather than discourage such behavior. JRL's practices and procedures "amounted to no more than a veneer of compliance with the FDCPA." *Miller* at \*27 (quoting *Nielson v Dickerson,* 307 F.3d 623, 638 (7th Cir. 2002)); *see also Turner v. J.V.D.B. & Assocs., Inc.* 318 F. Supp. 2d 681 (N.D. Ill. 2004) (granting summary judgment for consumer on bona fide error defense, finding passive reliance on creditor or debtor for information regarding bankruptcy inadequate where bankruptcy appeared on debtor's credit reports).

25

**C.    Unreliable Representations And Filing Of Baseless Claims Are The Natural Consequence Of An Industry Which Rewards Collectors Who Lack Adequate And Accurate Information**

Because of the high rate of default judgments entered in debt collection cases, courts are forced to rely primarily on affidavits and other representations of collectors. The court in *Midland* explained:

> Considering public policy, it is also worth noting many debt collection cases of these types place courts in the position of evaluating the validity of the plaintiff's claim without any response from the defendant. Thus, in general terms, courts rely on the assertions in an affidavit to determine, among other things, whether the debt is valid and judgment, usually default judgment, should be granted

*Id*. at *22-23. Courts should be able to, but currently cannot, rely on the collector and attorney to supply adequate and admissible documentation of the defendant's obligation in each case. One court lamented, "[w]ith great frequency, courts are presented with summary judgment motions by credit card issuers seeking a balance due from credit card holders which motions fail to meet essential standards of proof and form in one or more particulars." *Citibank (SD), N.A. v. Martin,* 2005 NY Slip Op 25536, 11 Misc. 3d 219, 807 N.Y.S.2d 284 (Civ. Ct., NY Co. Dec. 16, 2005). *See also MRC Receivables Corp. v. Zion*, No. 60926-2-I, 2009 WL 3418132, *3 (Wash. App. Div. 1 2009) (finding even if collector established delinquent account beyond question, it provided "no direct or even indirect proof of any written assignment" and "failed to meet its burden of establishing that it was entitled to judgment as a matter of law"); *Resurgence Financial, LLC v.*

*Taylor,* 05-07-01492-cv, 2009 WL 2712387, *4 (Tex.App.Dallas 2009) (affirming dismissal where evidence reflected a variety of conflicting rates and requirements and was insufficient to support the default judgment requested); *Asset Acceptance Corp. v. Proctor*, 804 N.E.2d 975 (Ohio Ct. App. 2004) (debt buyer failed to provide documentation of the charges, debits, and credits to permit court to calculate the balance claimed to be due).

Courts must hold collectors to their proof, especially because judgment in debt collection cases is often entered on default. Requiring strict adherence to legal standards deters collection law firms from merely "review[ing] the collection files with such speed that no independent judgment could be found to have been exercised, and then issu[ing] form collection letters with the push of a button." *Miller* at *22 (quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300. 306 (2d Cir. 2003)). Maintaining these standards it also deters collectors from ignoring evidence of a valid dispute or statute of limitations.

Courts justifiably are frustrated by the lack of professionalism and noncompliance with legal standards by some debt collectors. Attorney conduct which clearly violates the FDCPA or the making of assertions which are known to be untrue in order to obtain a judgment is intolerable. "Use of the court system to file a baseless legal claim" or "as an instrument of coercion" constitutes abuse of process. *Seipel v. Olympic Coast Investments*, 2008 MT 237, ¶¶ 25-27, 344 Mont.

27

415, 188 P.3d 1027 (2008). The attorney conduct in this case was particularly egregious. *See* Appellant's Br. at 15. The trial court found that JRL served requests for admissions which "appear[ed] to be designed to conclusively establish each element of [the] case and to use the power of the judicial process against a *pro se* defendant to collect a time-barred debt." *McCollough v. Johnson, Rodenberg & Lauinger,* 610 F. Supp. 2d 1247, 1256 (D. Mont. 2009). Not only is such conduct "abusive, unfair and unconscionable," as the trial court found, but it is inexcusable as a bona fide error. This finding is consistent with that of other courts rebuking conduct which not only harms debtors, but which also implicates the validity of the court's judgments. *See, e.g.*, *Harrington v. CACV of Colo., LLC,* 508 F. Supp. 2d 128, 139 (D. Mass. 2007) (finding "[i]f Defendants intentionally moved for default when they knew that Harrington was not in default, lying to the state court in order to harass or trick Harrington, there is no doubt that that would involve 'unfair surprise,' and would be unconscionable by any definition."); *Midland* at *19 (finding affidavit false and misleading and criticizing use of "such a patently false affidavit . . .[as] the standard form used at a business that specialized in the legal ramifications of debt collection."). There was no mistake in this case. Rather, the abuses were the natural consequences of a collection industry which rewards collection mills for having inadequate information in an overburdened judicial system in which most judgments are granted by default.

## CONCLUSION

The Court should affirm the judgment of the lower court.

Respectfully Submitted,

_____/s/_____

Julie Nepveu
AARP Foundation Litigation

Michael Schuster
AARP

601 E Street, NW
Washington, DC  20049
(202) 434-2060
jnepveu@aarp.org

## STATEMENT OF RELATED CASES

*Amicus Curiae* AARP is not aware of any related cases pending in this Court.


April 5, 2010                                          /s/
                                              Julie Nepveu

**CERTIFICATION OF COMPLIANCE PURSUANT TO
FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1
FOR CASE NUMBER 09-35767**

I certify pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1

that the attached Brief *Amici Curiae* of AARP and National Consumer Law Center

In Support of Appellee complies with the type-volume limitation of Fed. R. App.

P. 32(a)(5)and (6) as it is proportionately spaced, has a typeface of 14 points, and

contains 6,820 words, excluding the portions exempted by Fed. R. App. P.

32(a)(7)(B)(iii).

Date: April 5, 2010             _____/s/_____

                                              Julie Nepveu

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2010, I electronically filed the foregoing Brief *Amicus Curiae* of AARP and National Consumer Law Center In Support of Appellee with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit, with service of copies to the following counsel using the appellate CM/ECF system,

John C. Heenan, Esq.
HEENAN LAW FIRM
2602 1st Ave. N., Suite 305
PO Box 2278
Billings, MT 59103
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
Email: john@heenanlawfirm.com

John E. Bohyer, Esq.
Fred Simpson, Esq.
Jessie Lundberg, Esq.
BOHYER, SIMPSON & TRANEL, PC
P.O. Box 7729
Missoula, Montana 59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email: mail@bstlawfirm.com

_____/s/_____
Julie Nepveu